T.C. Memo. 1998-32

UNITED STATES TAX COURT

STEPHEN WILLIAM DAHLGREN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5002-94.                    Filed January 26, 1998.

<u>Joseph Y. Holman</u>, for petitioner.

<u>Dennis R. Onnen</u>, for respondent.

MEMORANDUM OPINION

CARLUZZO, <u>Special Trial Judge</u>:  This case was heard pursuant
to the provisions of section 7443A(b)(3) and Rules 180, 181, and
182.  Unless otherwise indicated, section references are to the
Internal Revenue Code in effect for the year 1990.  Rule
references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency in petitioner's 1990
Federal income tax in the amount of $5,594.  The issue for

decision is whether $20,000 paid to petitioner in 1990 by his former employer is excludable from gross income under section 104(a)(2). The resolution of this issue depends upon whether petitioner's former employer intended the payment to compensate him for personal injury arising from a tort or tort type claim.

Undisputed Factual Background

Some of the facts have been stipulated, and they are so found. At the time the petition was filed, petitioner resided in Springfield, Missouri.

In June 1989, petitioner, an attorney who apparently did not practice law during the year in issue, was hired as the vice president of institutional marketing and sales for Comprehensive Marketing Systems, Inc. (CMS). During the relevant periods CMS specialized in subservicing poorly performing loans for other financial institutions. During 1990, CMS earned gross receipts totaling approximately $12 million from 8 to 10 different loan servicing contracts.

Petitioner was hired by James Griffin, the president and sole shareholder of CMS, to develop a plan to market loan servicing to financial institutions in the mortgage lending and servicing business. CMS anticipated that petitioner's sales and marketing plan would generate revenues through the acquisition of additional loan servicing contracts.

On June 12, 1989, petitioner entered into a 2-year employment contract with CMS. In accordance with the terms of the employment contract, petitioner was entitled to the following compensation: (1) A salary of $7,500 per month for the first 3 months of employment; (2) a salary of $5,000, plus a "loan" of $2,500 per month for the remaining 21 months;[1] and (3) a commission of 1 percent of the gross revenues generated during the initial term of any loan servicing contracts he secured through his sales and marketing plan, plus ½ percent of the gross revenues with respect to the renewal period of any such contract. In the event that petitioner's employment with CMS terminated (for any of a variety of reasons), he was entitled to receive earned but unpaid salary and commissions. Throughout his employment with CMS, petitioner did not earn any commissions.

As an employee of CMS, petitioner had access to certain confidential information and trade secrets that were the property of CMS. He was obligated to use his "best efforts and the utmost diligence to guard and protect such confidential information and trade secrets", and was bound not to "disclose or permit to be disclosed to any third party or other person by any method

---

[1]The loans were evidenced by promissory notes and accrued interest at the rate of 11 percent per year. Principal and interest were payable from future commissions earned by petitioner.

whatsoever, any of such confidential information or trade secrets of CMS" without the prior written consent of CMS.

Apparently, petitioner's term of employment with CMS began with a 90-day probationary period, which he successfully completed. His "Probationary Employee Performance Evaluation", dated October 17, 1989, reflected that he had met the requirements of four out of five separate areas of performance, and he was recommended for "regular status". Rather than a check the box rating with respect to an area of performance designated "Knowledge", the following comments were made on the evaluation:

> It has been determined that you meet requirements for the purpose of attaining regular employee status, except in the area of knowledge where you require significant support to augment your minimal knowledge of the industry. However, as you are aware, the most critical measure of performance for this position is the generation of new business. Your performance in this area is vital to the company's growth and development, and will be the primary basis for future evaluations.

According to a Managerial Performance Evaluation, dated January 2, 1990, petitioner failed to meet the overall requirements for his job because he had failed to secure any loan servicing contracts. The evaluation indicated that petitioner's objective was to increase the loan servicing portfolio by a minimum of 60,000 new loans through subservicing contracts with other financial institutions on or before the second quarter of 1990, which he apparently failed to do. Consequently, petitioner received a "Fails to Meet Requirements" rating.

In a February 6, 1990, memorandum to an executive vice president of CMS, petitioner disputed the January 2, 1990, evaluation and provided detailed examples of how he believed that he had fulfilled his responsibilities at CMS. In this memorandum, among other things, petitioner represented:

> My own planning indicates that it is realistic to expect that 20,000 loans can be brought on by the end of the second quarter, 1990. That the total of new loans to be added by the end of calendar 1990 will be 95,000.

CMS responded to petitioner's memorandum; however, the "Fails to Meet Requirements" rating was not changed because petitioner's department "did not meet the principal requirements of generation of new business during the period under review."

By the end of February 1990 petitioner was aware that his employment with CMS would soon be terminated. At a meeting on or about May 18, 1990, petitioner and Mr. Griffin discussed petitioner's termination and signed an Agreement for Separation of Employment (the agreement) wherein petitioner agreed to resign voluntarily from CMS. Pursuant to the agreement, "as consideration for cancellation of the remaining portion of the employment contract", CMS agreed to pay petitioner $35,348.84. This amount consisted of (1) a lump-sum payment of $20,000 (which petitioner and CMS agreed would be subject to all "ordinary and necessary payroll deductions", resulting in a net payment of $15,070 made to petitioner as of the signing of the agreement),

and (2) $15,348.84 "in the form of a discharge of * * * [petitioner's] indebtedness to CMS".  In addition, the agreement provided that petitioner would be paid all unused vacation pay and earned but unpaid salary.  The agreement further provided:

4.  In consideration for the promises referred to herein, * * * [petitioner] * * * does hereby fully, finally and unconditionally release and forever discharge CMS and its affiliates and their respective former and present officers, agents, employees, directors and shareholders, * * * in their personal and corporate capacities, from any and all liabilities, claims, rights, obligations, charges, damages, costs, expenses, attorneys' fees, suits, actions, causes of action and demands, of any and every kind, nature and character, known or unknown, liquidated or unliquidated, absolute or contingent, in law or in equity, enforceable under any local, state or federal order, including without limitation Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. section 1001 et seq., and the District of Columbia Human Rights Law, as amended, D.C. code section 1-2511 et seq., which * * * [petitioner] * * * may now have, [has] ever had or may in the future have, which arise out of or are in any way connected with * * * [petitioner's] past employment with CMS or the termination of said employment or which arise out of or are in any way connected with any past actions or omissions of CMS, its affiliates, or their former and present officers, agents, employees, directors or shareholders, including without limitation retaliatory discharge claims, contract claims, tort claims and claims for wages, compensation, benefits, compensatory damages, punitive damages and reinstatement. * * *

* * * * * * *

6.  As further consideration for the promises referred to herein, * * * [petitioner] agrees that, without the express written authorization of an officer of CMS, * * * [petitioner] will not directly or indirectly disclose to any third party,  * * * any of CMS's trade secrets or other confidential information not known to the general public with respect to the business operations of CMS or its affiliates, including, but not

limited to the, information relating to management, operations, financial affairs, legal affairs, * * * bids, contracts, licensing and investment opportunities, acquisition and joint venture candidates, business plans, and business opportunities.

* * * * * * *

9. This Agreement sets forth all terms and conditions of the agreement between the parties. The parties understand and agree that the terms of this Agreement are contractual and not a mere recital. * * *

During his employment with CMS, petitioner was instrumental in the development of a relationship between CMS and Signet Bank (Signet). Petitioner introduced CMS executives to an "old pal" of his at Signet and ultimately CMS and the bank formed a business relationship. Signet provided the necessary "credit facility" that allowed CMS to contract with the Department of Housing and Urban Development (HUD). A "credit facility" is similar to a revolving line of credit. The credit facility in place between Signet and CMS during the relevant period could only be used by CMS in connection with its contract with HUD.

In May 1990, CMS was attempting to secure a contract with the Government National Mortgage Association (GNMA). Apparently to qualify for the contract CMS had to demonstrate certain financial responsibility. In a May 4, 1990, letter to GNMA (the GNMA letter) that included a business plan and proposal, CMS represented:

Currently, CMS has a $300,000 credit facility that can be utilized for advances necessary to meet monthly remittance requirements. The credit facility can be

increased if necessary. Reimbursement for advances will be facilitated through subsequent collections.

The credit facility that CMS had in place with Signet at that time was in the amount of $300,000; however, the Signet credit facility could not be used in connection with prospective GNMA business, nor was it subject to increase.

Many years prior to the year in issue, petitioner had been employed for a brief period of time as a staff attorney for a company involved in marketing franchises and other securities. As a result of this employment, petitioner was named as a defendant in a law suit brought by certain clients or customers of this company under various provisions of the Securities Act of 1933. Petitioner was named as a defendant in the suit merely because his name appeared on the letterhead of his former employer. Although the outcome of that proceeding has not been made part of the record, it does not appear that petitioner incurred any liability as a result of it.

Petitioner's 1990 Federal Income Tax Return

CMS issued a Form W-2 for the year 1990 to petitioner reflecting wages in the amount of $45,751.20. Federal income tax and FICA withholdings were computed based upon the entire amount and withheld. On his 1990 Federal income tax return, petitioner reported wages of $25,751.20. In an attachment to his 1990 return, petitioner explained that $20,000 of the amount he

received from CMS during 1990 was not taxable because the $20,000

represented payment for:

> [P]ersonal injuries sustained as a result of the
> tortious conduct of * * * CMS * * * who knowingly
> [made] false statements in writing to a U.S. Government
> official for the purpose of obtaining U.S. Government
> agency * * * [GNMA] approval of the purchase of a loan
> servicing portfolio by CMS.

The Notice of Deficiency

In the notice of deficiency, respondent increased

petitioner's taxable income by $20,000, characterizing the

payment as "separation pay" and explaining:

> It is determined * * * that the employment contract
> separation pay of $20,000 which was included in your
> Form W-2 from * * * [CMS] was not reported on your tax
> return. Accordingly, taxable income is increased
> $20,000 for 1990.

Controlling Legal Principles

Separation or severance pay, like other forms of

compensation for services, is generally includable in the income

of the recipient.  Sec. 61(a)(1); Brennan v. Commissioner, T.C.

Memo. 1997-317; sec. 1.61-2(a)(1), Income Tax Regs.  In general,

section 104(a)(2) excludes from gross income "the amount of any

damages received * * * on account of personal injuries".  Only

damages that are received:  (1) In connection with a claim based

upon a tort, or tort type right; and (2) on account of personal

injury or sickness, are excludable from the recipient's income.

Sec. 104(a)(2); Commissioner v. Schleier, 515 U.S. 323, 337

(1995).

In a situation such as presented here, where payment to a former employee has been made pursuant to some agreement, the nature of the claim that led to the agreement and payment must be examined in order to determine whether the provisions of section 104(a)(2) apply. United States v. Burke, 504 U.S. 229, 237 (1992).

Dispute Between the Parties

There is no disagreement between the parties with respect to the above-stated general principles of Federal income taxation. The dispute between the parties focuses upon the nature of the claim, if any, that petitioner had against CMS, and the characterization of the $20,000 payment petitioner received from CMS in 1990.

Respondent argues that the $20,000 payment constitutes severance pay petitioner received in satisfaction of any future commissions he might have been entitled to receive, and consequently must be included as such in petitioner's income. Petitioner maintains that he had a tort claim (intentional infliction of mental distress) against CMS, and argues that the payment represents the settlement of that tort claim. Therefore, according to petitioner, the payment is of the type that is excludable from income under section 104(a)(2), and his 1990 Federal income tax return reflects his correct Federal income tax liability for that year.

In advancing their respective arguments regarding the nature of the claim petitioner had against CMS and the characterization of the payment here under consideration, neither party relies entirely upon the express language of the agreement, no doubt due to the manner in which it was drafted. Not unlike releases we have examined in other cases involving the application of section 104(a)(2), the agreement is all encompassing, covering all contract and tort claims that petitioner potentially had against CMS. In such situations, we look to the intent of the payer in order to determine whether the provisions of section 104(a)(2) are applicable, Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C. Memo. 1964-33; Agar v. Commissioner, 290 F.2d 283 (2d Cir. 1961), affg. per curiam T.C. Memo. 1960-21, and focus upon the May 1990 meeting between petitioner and Mr. Griffin that apparently formed the basis for the agreement and the payment here under consideration.

Both parties presented their respective versions of what took place during that meeting. Petitioner did so through his own testimony. Respondent did so through the testimony of Mr. Griffin. After listening to and reviewing the testimonies of these individuals, the Court cannot help but wonder if they were describing the same event.

Petitioner's account centers on the GNMA letter, which contained a bid on a loan servicing contract and indicated that a

$300,000 credit facility was available for the contract. During the meeting petitioner allegedly asked Mr. Griffin "how he [Mr. Griffin] could publish this letter with what was clearly a misleading statement in it to a government official", and whether he had any "appreciation for the harm" done to petitioner by that statement. Petitioner considered the statement about the available credit facility to be "false" and "misleading" because he assumed that the statement referred to the credit facility set up by Signet, which credit facility could only be used in connection with the HUD contract. Petitioner claims that he was concerned about the possibility of somehow being held accountable for what he believed to be the misstatement. He further claims that due to the above-described experience with his prior employer, he was concerned that he might be sued, or otherwise suffer some damage or harm to his professional reputation. Nothing in petitioner's version of the meeting suggests that future commissions were discussed.

Mr. Griffin's version of the meeting focuses on petitioner's employment performance and employment contract. According to Mr. Griffin, petitioner voluntarily resigned because he agreed that his performance had not met CMS's expectations. According to Mr. Griffin, during the meeting petitioner indicated that he had contacted certain financial institutions, and claimed entitlement to potential future commissions that would result if CMS secured

any contracts as a result of these contacts. To resolve any potential disputes regarding commissions which petitioner might have been entitled to receive, Mr. Griffin claims that he agreed, after some negotiation as to the amount, to pay petitioner $20,000 and cancel petitioner's $15,000 indebtedness to CMS. According to Mr. Griffin, the GNMA letter was not discussed during this meeting. Moreover, according to Mr. Griffin, the statements in the GNMA letter were accurate because the letter did not refer to the credit facility then in place with Signet, but was a reference to an arrangement with a different financial institution. According to Mr. Griffin, the GNMA letter was reviewed and discussed among CMS employees and contained no false information.

Resolution of the Dispute

After hearing and reviewing the testimonies of petitioner and Mr. Griffin, having observed each witness during the trial, we are not convinced that either was entirely candid with the Court. By the time of the May 1990 meeting and agreement, petitioner had been aware for several months that his employment with CMS was going to be terminated. Obviously his relationship with CMS and Mr. Griffin had deteriorated significantly by May 1990. By his own account in his response to his poor managerial performance evaluation, petitioner indicated that he expected that "95,000" new loans could be added to CMS's portfolio by the

close of 1990.  Presumably such an occurrence would have entitled petitioner to some, if not substantial, commissions.  We find it highly unlikely that the May 1990 meeting between petitioner and Mr. Griffin did not include any discussion about potential future business that might have resulted from petitioner's efforts while employed by CMS.  We are unwilling to accept petitioner's version of what took place at the May 1990 meeting and his explanation as to why the $20,000 payment was made to him.  Furthermore, petitioner's explanation as to why he received the $20,000 payment is inconsistent with the provisions of the agreement subjecting the payment to payroll deductions.

On the other hand, we are not completely satisfied with Mr. Griffin's version of the May 1990 meeting either.  Mr. Griffin testified that the GNMA letter was not discussed.  It is clear from the record that if the reference in the GNMA letter was to the Signet credit facility, the letter contained false statements.  Knowing that his employment with CMS was soon to end, we find it more likely than not that petitioner, believing the GNMA letter to contain false representations, called it to Mr. Griffin's attention, for whatever doing so might have been worth to petitioner.  We are somewhat disturbed that Mr. Griffin could not support his claim regarding the accuracy of the GNMA letter with supporting documentation, and also with the amount of the payment made to petitioner upon termination of employment

with CMS. According to Mr. Griffin, the entire amount paid to petitioner pursuant to the agreement constituted payment for potential future commissions. Mr. Griffin did not explain why CMS would agree to pay petitioner what appears to be so generous an amount given petitioner's failure prior to that point in time to earn any commissions.

Nevertheless, considering the entire record, although we would be reluctant to exactly characterize the nature of the $20,000 payment, we are satisfied that CMS did not intend the payment to compensate petitioner for any personal injury arising from any tort or tort type claim that petitioner had against CMS. The provisions of section 104(a)(2), therefore, do not apply. It follows, and we hold, that petitioner may not exclude the $20,000 payment from his 1990 income, and respondent's determination in this regard is sustained.

Based on the foregoing,

<u>Decision will be</u>

<u>entered for respondent</u>.